**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA** :

                         :

        **v.**                              **1:19-cr-356 (RDM)**

                         :

**DAVID HARRIS** :

## EMERGENCY MOTION FOR RELEASE FROM CUSTODY DUE TO IMMEDIATE THREAT POSED BY COVID-19 PANDEMIC

DAVID HARRIS, by and through undersigned counsel, respectfully moves this Court pursuant to 18 U.S.C. § 3142 (i) and the Eighth Amendment to the United States Constitution, for immediate release from the custody of the U.S. Marshals Service, through the D.C. Department of Corrections (DDOC). The close contact and conditions of incarceration are unsafe in light of the global pandemic that has, as of March 11, 2020, been declared by the World Health Organization (WHO),[1] and, as of March 13, 2020, been declared a national emergency by the President.[2] These conditions pose a substantial risk of serious illness and possible death to Mr. Harris. Under these unique circumstances, the Court should release Mr. Harris, at least until the resolution of this outbreak.

In support of this Motion counsel states:

---

[1] World Health Organization, Director-General Opening Remarks (March 11, 2020) https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

[2] "Trump Declares National Emergency Responding to Coronavirus: Here's What that Means," Libby Cathey, ABC News (March 13, 2020), Available at: https://abcnews.go.com/Politics/trump-declares-national-emergency-responding-coronavirus-heres-means/story?id=69586419

1.    Mr. Harris is charged by indictment with unlawful possession of a firearm under 18 U.S.C. 922(g).  He has been detained since August 9, 2019 at the D.C. Jail for the entirety of his case.

2.    Mr. Harris pleaded guilty to one count of Distribution of Child Pornography on November 8, 2019.  His sentencing hearing is currently set for April 14, 2020.

3.    On March 11, 2020, the World Health Organization declared a global pandemic based on the coronavirus, or COVID-19.  Citing "deep[] concern[] both by the alarming levels of spread and severity, and by the alarming levels of inaction," it called for countries to take "urgent and aggressive action."[3]

4.    On March 11, 2020, Mayor Muriel Bowser declared a Public Health Emergency in the District of Columbia.[4] She issued an Order identifying COVID-19 as an imminent threat to the health, safety and welfare of D.C. residents, requiring emergency protective actions to be taken by the D.C. Government.[5]

5.    On March 13, 2020, President Trump declared a national emergency as a result of the COVID-19 outbreak.

---

[3] *Id.* and "Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO Says," NPR (March 11, 2020). Available at: https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says.

[4] D.C. Government (March 11, 20202), https://coronavirus.dc.gov/release/mayor-bowser-declares-public-health-emergency

[5] D.C. Government, Order of the Mayor (March 11, 2020), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/MO.DeclarationofPublicHealthEmergency03.11.20.pdf

6.      COVID-19[6] is an infectious disease caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a virus closely related to the SARS virus. [7] In its least serious form, COVID-19 can cause illness including fever, cough, and shortness of breath. However, for individuals who become more seriously ill, a common complication is bilateral interstitial pneumonia, which causes partial or total collapse of the lung alveoli, making it difficult or impossible for patients to breathe. Thousands of patients have required hospital-grade respirators, and COVID-19 can progress from a fever to life-threatening pneumonia with what are known as "ground-glass opacities," a lung abnormality that inhibits breathing.[8]

7.      As of March 18, 2020, over 200,000 people in over 120 countries have been diagnosed with coronavirus and over 8000 people have died as a result.  As of March 17, 4,226 people have been diagnosed in the United States, with 75 deaths confirmed.  As of March 18, the number has increased to 7,323 cases and 108 deaths.  53 jurisdictions in the United States, including the District of Columbia, have confirmed positive tests.[9]

8.      The number of people infected is growing exponentially. The death toll in the nation of Italy, which began experiencing this epidemic about a week earlier than the first diagnosed American cases, saw a rise of 30% overnight in the 24 hours between March 5, 2020, and March 6, 2020.[10] By the filing of this motion, less than two weeks later, Italy had suffered from 3,405 deaths.  Experts predict similar rapid growth will soon occur in the United States.

---

[6] Centers for Disease Control, Coronavirus 2019, https://www.cdc.gov/coronavirus/2019-ncov/index.html

[7] Briefing from the White House Coronavirus Task Force, last updated March 12, 2020. Available at: https://www.cdc.gov/coronavirus/2019-ncov/index.html.

[8] "Ground Glass Opacification," Radiopaedia.com, last accessed: March 12, 2020.

[9] Centers for Disease Control, Coronavirus 2019, https://www.cdc.gov/coronavirus/2019-ncov/cases-in-us.html

[10] "Italy coronavirus deaths near 200 after biggest daily jump," Crispian Balmer, Angelo Amante, *Reuters*, March 6, 2020, available at: https://www.reuters.com/article/us-health-

3

9.      It is also clear that, currently, the numbers of people diagnosed reflect only a portion of those likely infected;[11] very few people have been tested, and many are asymptomatic,[12] so they don't even know they should be tested.  As a result, thousands of people are likely living day to day and carrying a potentially fatal disease that is easily transmitted – and no one is aware of it.

10.     Upon information and belief, at least one inmate at the D.C. Jail has been presumptively determined to have contracted COVID-19.  He is apparently being isolated but it is not clear if he is in the medical unit at CTF.

11.     In addition, a U.S. Marshal who was in close contact with individuals being brought to the Jail and CTF from D.C. Superior Court has contracted COVID-19.

12.     The current estimated incubation period is between 2 and 14 days, meaning that a patient who begins showing symptoms today may have been contagious for as long as two weeks prior.[13]  The current estimated rate for life-threatening complications is approximately 20%, with

---

coronavirus-italy/italy-coronavirus-deaths-near-200-after-biggest-daily-jump-idUSKBN20T2ML.

[11] "True Number of US Coronavirus Cases is Far Above Official Tally, Scientists Say," Melissa Healy, *Los Angeles Times,* March 10, 2020, available at: https://www.msn.com/en-us/health/medical/true-number-of-us-coronavirus-cases-is-far-above-official-tally-scientists-say/ar-BB110qoA

[12] "They were Infected with the Coronavirus. They Never Showed Signs," Roni Caryn Rabin, *New York Times*, February 26, 2020 (updated March 6, 2020), available at: https://www.nytimes.com/2020/02/26/health/coronavirus-asymptomatic.html, and "A Person Can Carry And Transmit COVID-19 Without Showing Symptoms, Scientists Confirm," Aria Bendix, *Business Insider*, February 24, 2020, available at: https://www.sciencealert.com/researchers-confirmed-patients-can-transmit-the-coronavirus-without-showing-symptoms.

[13] "Coronavirus Disease COVID-19 Symptoms," Centers for Disease Control, last updated: February 29 2020, available at: https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html.

a fatality rate estimated at between 1% and 5%. All of these risk assessment numbers, however, appear to be rising.

13. The District of Columbia had, as of March 16, 22 official cases of COVID-19 that have been confirmed by the Department of Forensic Science and the Mayor's Office.[14] By the morning of March 19, the number of cases has increased to 39. The District has also notified hundreds of individuals that they may have been exposed in community-based settings such as churches and political rallies, and recommends self-quarantine for those individuals. In the last few weeks, several entire nations have declared lockdowns, and cities and institutions across the United States are closing public events, workplaces, and schools.

14. The virus is thought to spread[15] mainly between people who are in close contact with one another (within about 6 feet) through respiratory droplets produced when an infected person coughs or sneezes. It also may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes. What doctors and experts are calling "community spread" is at the root, and "social distancing" is being enforced as the best method of prevention. Social distancing means, in essence, isolating oneself from other people as much as possible: working from home, avoiding travel, avoiding crowds and contact with others, not touching common surfaces, and generally staying at least 6-12 feet from other people as much as possible.

15. On March 11, 2020, a study was submitted for peer review suggesting that the COVID-19 virus is airborne, and can remain viable in the air for up to three hours after

---

[14] D.C. Government, March 11 Update: https://coronavirus.dc.gov/release/coronavirus-data-update-march-11
[15] Centers for Disease Control, Coronavirus Factsheet, March 3, 2020: https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf

becoming aerosolized.[16] The virus can get into the air when someone who is infected, even if they are asymptomatic, breathes, coughs, or sneezes, or if their bodily fluids are released into the air. The study also confirms earlier reports that the virus can remain active and transmissible on plastic, metal, and other surfaces for up to three days.

16. The Centers for Disease Control (CDC) National Center for Immunization and Respiratory Diseases has issued recommendations for safety precautions that individuals and communities should take to lessen the further spread of the illness and to protect oneself from contracting it. Among those measures are frequent, thorough hand-washing, avoiding touching one's own face or other people's faces, the use of alcohol-based hand sanitizers when soap and water are not available, frequent cleaning with antiseptic cleansers of frequently touched items and surfaces, and social distancing.

17. D.C. DOC's own employee screening form for COVID-19 defines "close contact" with someone diagnosed with or under investigation for possible COVID-19 as "approximately 6 feet" *or* "within the room or care area for a prolonged period of time without wearing recommended personal protective equipment (gowns, gloves, respirator, eye protection)" *or* "having direct contact with infectious secretions (e.g., being coughed on) while not wearing recommended personal protective equipment." Most cases of COVID-19 are likely currently undetected, so the numbers of people who are diagnosed or under investigation are unreflective of who is actually carrying the infection.

18. Mr. Harris has a cellmate at the D.C. Jail.

---

[16] "Tests Indicate Coronavirus can Survive in the Air," John Bowden, *The Hill*, March 11, 2020, available at: https://thehill.com/policy/healthcare/487110-tests-indicate-coronavirus-can-survive-in-the-air

19. Another main preventive tool is disinfection of surfaces and spaces around oneself.[17] The CDC distinguishes between cleaning and disinfecting, and recommends that all surfaces that are touched frequently – doorknobs, light switches, countertops, handles, desks, phones, faucets, keyboards, toilets and sinks – be both cleaned *and* disinfected at least daily.[18]

20. It is virtually impossible to engage in these basic preventive measures, as urged by the CDC, when incarcerated at the D.C. Jail. The DDOC is incapable, due to its correctional, rather than medical, mission, of meaningfully following the CDC's guidance. Indeed, jails and prisons are generally at grave risk due to their inherent structure and mission, for the transmission of infection.[19]

21. People incarcerated at the DDOC facilities in Washington, D.C., are:

   a. Housed in cells that generally hold more than one person, meaning that beds and living space are in close quarters, and unable to choose otherwise;

   b. Near-constantly in communal spaces, such as eating areas, bathrooms, and cells or holding areas, and unable to choose otherwise;

   c. Living in spaces with open toilets within a few feet of their beds, meaning that infection-transmitting fecal and other matter is not contained, and that bodily fluids that could contain viruses are

---

[17] Centers for Disease Control, Environmental Cleaning and Disinfection Recommendations: https://www.cdc.gov/coronavirus/2019-ncov/community/home/cleaning-disinfection.html
[18] Centers for Disease Control, Steps to Prevent Illness: https://www.cdc.gov/coronavirus/2019-ncov/about/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fprevention-treatment.html
[19] "Prisons and Jails are Vulnerable to COVID-19 Outbreaks," Nicole Wetsman, *The Verge*, March 7, 2020, available at: https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap

      aerosolized into the air inside the cell every time either person in the cell uses the toilet, and unable to access a closed toilet that would not aerosolize bodily fluids into their living spaces;

d. Near-constantly in "close contact" with others, nearly all of whom have not been tested for COVID-19, and unable to choose otherwise;

e. Frequently in actual physical contact with others, such as correctional officers, kitchen staff, and medical staff, many of whom have not been tested for COVID-19, and unable to opt out of this contact;

f. Subjected to frequent intimate contact by correctional staff, many of whom have not been tested for COVID-19, during searches of their person, including having those staff place their hands inside of people's mouths and other body cavities;

g. Lacking regular, uninhibited access to soap, water, tissues and paper towels, and the jail commissary, upon information and belief, does not stock antiseptic soap;

h. Lacking access to hand sanitizer that complies with the CDC's guidelines of being over 60% alcohol, as it is considered contraband and prohibited inside the DDOC facilities.

22. People in DDOC facilities also lack access to quality, efficient medical care. Although an incarcerated person can fill out paperwork asking to see a member of the medical staff, those slips take at least a day, and sometimes more than a week, to process. Between the time when someone asks to see a medical professional and the time the person is actually seen to be assessed for crucial symptoms such as fever or breathing problems, nor only

could their condition become critical, but they could infect their cellmate or anyone else they came into contact with. Further, Patients at CTF are treated by medical staff supervised by medical doctors, but who are themselves not doctors, much less infectious disease specialists, internists, pulmonologists, or emergency medical specialists.

23. In a memorandum to Maryland judges, renowned physicians in the Maryland State Medical Society have urged Maryland judges to: 1) Immediately implement community-based alternatives to detention to alleviate potential exposure to COVID-19 in jails and prisons; and 2) Incarcerate as few people as possible in order to mitigate the harm from a COVID-19 outbreak. Detained populations are at high risk to contract a virus like COVID-19 which spreads through respiratory droplets. See Exhibit A. The logic underlying the urgent request by medical professionals applies to the D.C. Jail and Mr. Harris' case. In fact, many Maryland defendants are actually housed at the D.C. Jail.

24. This combination of lack of adequate sanitation, close quarters, and limited medical capacity create the perfect storm to put people at greater risk of mortality if they are held in custody at a time when COVID-19 enters the facility. And all evidence suggests that there is no way to prevent that from occurring, given the number of newly detained people, staff, and visitors entering and leaving the facility on a daily basis just to keep the basic functions of the facility running.[20] Even if visitations are reduced or halted, the number of people being admitted

---

[20] "What Happens to People's Legal Cases as Coronavirus Shuts Down Courts?" NPR Weekend Edition (March 13, 2020), Available at: https://www.npr.org/2020/03/14/815778399/what-happens-to-peoples-legal-cases-as-coronavirus-shuts-down-courts

9

and released from the facility and the movement of staff in and out,[21] makes attempted containment impossible.[22]

25. Isolation, segregation or attempted lockdown, for the above reasons, are largely futile in the face of the COVID-19 pandemic. COVID-19 can survive in the air, so separation in a facility where there is still other movement of people, and occasional interaction, will not contain it. Surfaces are still touched – inside cells, in bathrooms, and in transport, at the very least. And under lockdown, the ability to self-protect through bodily movement (such as using elbows instead of hands) is impossible. The number of people moving in and out every day alone creates a risk for someone who is trapped inside and cannot self-protect elsewhere. Further, the reality is that some contact with others – in close proximity and actual contact – is inevitable. Kitchen staff, intake staff, officers and medical staff all interact with incarcerated people as a matter of course. Additionally, growing research demonstrates the permanent damage to people done by solitary confinement and isolation within correctional facilities,[23] making attempted containment by isolation an unacceptable – and incompatible – path to pursue toward safety and health.

---

[21] "No Need to Wait for Pandemics: the Public Health Case for Criminal Justice Reform," *Prison Policy Initiative*, March 6, 2020, available at: https://www.prisonpolicy.org/blog/2020/03/06/pandemic/;

[22] "The Coronavirus Could Spark a Humanitarian Disaster in Jails and Prisons," Premal Dharia, *Slate*, March 11, 2020, available at: https://slate.com/news-and-politics/2020/03/coronavirus-civil-rights-jails-and-prisons.html

[23] "Solitary Confinement: Torture in U.S. Prisons," *Center for Constitutional Rights*, May 31, 2012, available at: https://ccrjustice.org/home/get-involved/tools-resources/fact-sheets-and-faqs/torture-use-solitary-confinement-us-prisons

26. For all of these reasons, Mr. Harris's constitutional rights, health and safety, and potential mortality are threatened by his incarceration, and this Court should release him from custody. Neither CDF nor CTF are equipped to protect his safety and health.

27. Mr. Harris had no prior arrests before this case.

28. Mr. Harris has also been evaluated by Dr. Chris Kraft, a Johns Hopkins psychologist who specializes in sexualized behavior. Through a series of tests and interviews, Dr. Kraft has concluded that he sees no evidence that Mr. Harris is a risk of reoffending. Dr. Kraft has told counsel: "Mr. Harris has no sexual, psychological or mental health diagnoses that makes him any sort of risk." He concludes: "His risk is minimal if not zero" and that "there is no indication he would try to do anything in person." He therefore meets "no criterion of recidivism risk."[24]

29. In addition, the conduct to which Mr. Harris pleaded guilty occurred in the fall of 2018. Mr. Harris was monitored by law enforcement for an additional nine months. No illegal conduct was observed and his electronic device contained no evidence of illegal conduct in the nine months prior to his arrest.

30. Mr. Harris can reside with his mother. The Court can prohibit him from any use of electronic devices.

31. Despite issuing self-reporting screenings to employees and, upon information and belief, some visitors upon entering its facilities, the DDOC has not – and cannot – come close to meeting its obligations to protect those in its custody. The current situation calls for, in addition to a variety of internal protective measures (including testing, disinfecting, and increasing bodily

---

[24] Dr. Kraft orally conveyed this information to counsel because his report has not been completed.

11

autonomy to protect oneself), considering the release of people in custody to decrease exposure for everyone, and to ease the burden on staff and medical personnel. In Iran, over 50,000 incarcerated people were temporarily released in response to the COVID-19 outbreak.[25] Upon information and belief, DDOC is not engaged in consideration about whether some people can and should be released.

32. Despite the substantial risk of harm, officials have not yet acted. Based on their knowledge of the inner workings of their facilities, DDOC officials should be seeking the release of people from the courts or from public officials. And public officials should be actively engaged in reducing the number of people inside the facilities. Pursuant to the Eighth Amendment, undersigned counsel implores this Court to act and to immediately release Mr. Harris from DDOC custody.

33. Release *enhances* the safety of other people and the community. Indeed, it is incarceration that is dangerous in the context of the COVID-19 pandemic. It is safer for other people in the jail, for the staff of the jail, for lawyers and court personnel, and for the community well beyond that, if X is able to exercise self-protective measures in a sanitary, disinfected space, and to maintain the type of social distance that other community members are now engaging in. Release will reduce the risk that he or anyone else transmits or receives the infections.

34. The Court, in its discretion, must determine whether release under 18 U.S.C. § 3142 (i) is approrpriate. The Bail Reform Act provides for the "temporary release" of a person

---

[25] "Iran Releases Prisoners on a Temporary Basis to Halt the Spread of the Coronavirus," Aresu Eqbali and Isabel Coles, *The Wall Street Journal,* March 3, 2020, available at: https://www.wsj.com/articles/iran-releases-prisoners-on-a-temporary-basis-to-halt-the-spread-of-the-coronavirus-11583244155

in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).

35. Given the worldwide health emergency and the counsel of medical professionals regarding the dangers of incarceration to public health, this Court has a substantially compelling reason to apply the discretion allowed by the Bail Reform Act.

36. Alternatively, Mr. Harris' continued detention at the D.C. Jail violates the Eighth Amendment, and he should be immediately released with the appropriate conditions, if necessary.  Further, this Court can consider temporary release until both the resolution of this global health crisis and the creation of safe and constitutionally compliant conditions inside the facility.

WHEREFORE, for the reasons stated above, as well as any other reasons that become apparent to the Court, the defense respectfully requests that the Court grant this Motion and order the Department of Corrections to release Mr. Harris.

           Respectfully submitted,

           A. J. KRAMER
           FEDERAL PUBLIC DEFENDER

           /s/
           _____
           EUGENE OHM
           Assistant Federal Public Defender
           625 Indiana Avenue, N.W., Suite 550
           Washington, D.C.  20004
           (202) 208-7500